AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

NOV **27** 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT

### for the
### Southern District of California

In the Matter of the Search of           )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )        Case No.    **19MJ5303**
                                          )
Apple, Inc., One Infinite Loop, Cupertino, California )
95014 (cmdlc92@icloud.com)                )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Importation of a Controlled Substance; Conspiracy to Import Controlled Substances |

The application is based on these facts:

See attached Affidavit of Special Agent Jacob Schneeberger

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Jacob Schneeberger, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  11/27/19

*Judge's signature*

City and state:  San Diego, CA

Hon. Jill L. Burkhardt
*Printed name and title*

**AFFIDAVIT**

I, Jacob R. Schneeberger, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the Apple ID: **cmdlc92@icloud.com**, that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.      I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been employed by ICE/HSI since January of 2016.  My duties include investigating the trafficking of illicit controlled substances and the importation and distribution of illegal substances.  I am a graduate of the Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training program at the Federal Law Enforcement Training Center in Glynco, GA.  I have received basic training in conducting narcotics smuggling investigations and the enforcement of numerous Immigration and Customs laws within the United States.  Prior to my employment with HSI, I was employed as a full-time, sworn federal agent with the United States Border Patrol since January 2003, having graduated from the USBP Basic Border Patrol Training Academy at the Federal Law Enforcement Training Center in Glynco, Georgia.  The 20-week Academy curriculum covers specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21 United States Code. My training has also included the use of cellular and digital telephone and other electronic devices

1

used by narcotics smugglers in the normal course of their illicit activities.

3.      In the course of my duties, I have worked as the case agent, directing specific drug-related investigations. I have also worked as a surveillance agent and observed and recorded movements of individuals trafficking in drugs and of those suspected of trafficking in drugs. Additionally, I have participated in the execution of numerous search warrants. I have initiated and executed numerous arrests for drug-related offenses, including possession with the intent to distribute and the importation of controlled substances. I have interviewed defendants, witnesses and informants relative to the illegal trafficking of controlled substances. Through these experiences, I have gained a working knowledge and insight into the normal operational habits of narcotics smugglers, with particular emphasis on those who attempt to import narcotics into the United States from Mexico at San Diego international ports of entry.

4.      As an agent, I have participated in numerous major narcotic trafficking investigations.   I have been present and participated in undercover surveillance operations, the purchase of large amounts of narcotics, vehicle stops with large seizures of narcotics recovered, and interviewed many suspects who were arrested to further enhance my training and understanding of the narcotics trafficking industry.

5.      During the course of my duties and while assisting other law enforcement personnel, I have interviewed or conversed with countless narcotic users.  From these conversations and interviews, I have become familiar with the manner in which controlled substances are packaged, marketed and consumed.

6.      Through the course of my training, investigations and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities.  Conspiracies involving narcotics smuggling generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail

2

messages referring to the arrangements of travel and payment, names and contact information for co-conspirators, photographs, text messages, emails, messages from text messaging cell phone applications such as WhatsApp, social networking messages, and videos reflecting co-conspirators or illegal activity.

7.   In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations, and the opinions stated below are shared by them.  Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

8.   The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.   Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of Title 21, United States Code Sections 952, 960 and 963, as described in Attachment B.

## JURISDICTION

10.   This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

**A.   MADRIGAL's Arrest**

11.   On April 11, 2019, at approximately 5:33 a.m., Claudia Aide MADRIGAL De La Cruz ("MADRIGAL"), a United States citizen, applied for admission into the United States through the San Ysidro Port of Entry (POE) in California.  MADRIGAL was the driver, sole occupant, and registered owner of a grey 2013 Honda Civic bearing California plate 7BIC978 ("the vehicle").

3

12.     MADRIGAL told CBP Officer Serrano at primary inspection that she was going to work in National City, California, and that she worked every day. CBPO Serrano noticed that MADRIGAL's crossing history did not show regular daily crossings. Officer Serrano opened the trunk of the vehicle and noticed anomalies in the passenger side rear quarter panel.

13.     CBPO J. Castilla screened the vehicle with his assigned Narcotics Human Detector Dog (NHDD). The NHDD alerted to the passenger's side door seam. Z-Portal revealed anomalies in the doors, quarter panels, and rear bumper of the vehicle. CBPO Macisaac pried open the driver's side rear quarter panel and discovered plastic-wrapped packages with white crystal substance that tested positive for methamphetamine.

14.     CBPOs seized seventy-nine (79) packages of methamphetamine from MADRIGAL's vehicle. CBPOs removed 5 packages from the driver's side rear quarter panel, 11 packages from the passenger's side rear quarter panel, 17 packages from the rear bumper, 14 packages from the passenger's side rear door, 13 packages from the passenger's side front door, 8 packages from the driver's side rear door, and 11 packages from the driver's side front door. The total weight of the packages was approximately 80.86 pounds (36.68 kilograms). A DEA laboratory report confirmed that the packages contained 35 kilograms of actual methamphetamine. MADRIGAL was arrested for violating Title 21 United States Code, Sections 952 and 960, Unlawful Importation of a Controlled Substance.

15.     MADRIGAL was advised of her *Miranda* rights and elected to make a statement. MADRIGAL stated she lived in an apartment on 1933 E Avenue in National City, California with her mom and sister, and was employed by Walmart on Highland Street in National City, California. MADRIGAL claimed that on the morning of her arrest, she was coming from her brother's house in Tijuana, Mexico and heading to her house in National City, California. MADRIGAL claimed that her brother, Gustavo Madrigal, cannot cross the border because he was previously deported. MADRIGAL

4

1  stated that she has two minor children who are with her brother in Tijuana, because he is
2  watching them over their two-week spring break.

3      16.   MADRIGAL claimed that her brother borrowed the Honda the day before
4  around 4:00 P.M. to take out his girlfriend.  The next time MADRIGAL saw the Honda
5  was the following morning, at 3:30 A.M., when it was parked in the street near her
6  brother's house.  MADRIGAL then drove it to the San Ysidro Port of Entry. When asked
7  whether her brother put drugs in her vehicle, MADRIGAL stated, "That is what comes to
8  mind."

9      17.   MADRIGAL claimed she didn't know how her brother would retrieve the
10  drugs from her vehicle.  She confirmed that her brother is a deported alien and cannot
11  cross the border.  MADRIGAL said she planned to go to her National City apartment and
12  park the Honda in a parking space in front of a multi-unit (4) single residence. She was
13  going to sleep for a few hours before going to work. She lives in the bottom unit and can
14  see one of the parking spots designated for her apartment.

15      18.   MADRIGAL stated she is a casual methamphetamine user and uses once or
16  twice a week. She claimed that the small bindle of methamphetamine found on her person
17  at the time of her arrest by one of the CBPO was given to her by her brother.

18      19.   MADRIGAL was offered to make a phone call to tell someone about her
19  arrest and make arrangements to watch her children.  MADRIGAL declined to use her
20  phone to make a call, saying her children are with her brother.  When asked for her
21  brother's phone number, she said he does not have a phone and she does not know his
22  girlfriend's phone number.

23  **B.   MADRIGAL's iPhone**

24      20.   At the time of her arrest, MADRIGAL was in possession of a rose gold
25  Apple iPhone 8 Plus, IMEI: 354834096919174. MADRIGAL declined to give agents the
26  passcode to her phone. On August 7, 2019, I applied for, and Magistrate Judge Mitchell
27
28

5

1    D. Dembin signed a search warrant (19MJ3311), authorizing the search of MADRIGAL's
2    iPhone for the time period from December 31, 2018, through April 11, 2019.

3         21.    MADRIGAL's phone was forensically downloaded on August 21, 2019.
4    According to the report prepared by Computer Forensics Agent Christopher R. Grunst,
5    the number associated with MADRIGAL's iPhone is 619-623-4265 (the same number
6    MADRIGAL provided post-arrest), and the Apple ID associated with MADRIGAL's
7    phone is cmdlc92@icloud.com.[1]   Because the device was PIN locked, only a partial
8    extraction of data was obtained.

9         22.    According to Agent Grunst's extraction report, MADRIGAL also had an
10    iCloud account. MADRIGAL's phone data was last backed up to the Apple iCloud on
11    April 9, 2019. (MADRIGAL's crossing history shows that her last crossing into the
12    United States before her arrest was on April 9, 2019.)

13         23.    I requested and received account information from the phone provider
14    Verizon Wireless regarding 619-623-4265, the phone number confirmed by forensic
15    extraction of the iPhone 8 Plus seized from MADRIGAL. According to Verizon, the
16    subscriber name for that number is Claudia Delacruz (MADRIGAL's full name is Claudia
17    Madrigal De La Cruz), with activation date of April 2, 2019.

18         24.    I obtained information regarding MADRIGAL's employment with
19    WalMart. According to the witness interviews and employment records, MADRIGAL
20    worked at the WalMart store in National City, California, from July 2018 until
21    approximately February 16, 2019. WalMart provided two additional phone numbers for
22    MADRIGAL from their records, 619-372-8578 and 619-274-4537.

23    //
24    //
25    //

---

26    [1] "cmdlc" appears to stand for MADRIGAL's initials, "Claudia Madrigal De La Cruz,"
27    while "92" may refer to the year she was born.

28                       6

**C.    Additional Phone Numbers**

25.    I requested and received information for 619-372-8578 from Verizon Wireless.    The subscriber name on the account was Claudia Delacruz, IMEI: 354834096919174 (the same unique number as the iPhone 8 seized from MADRIGAL at the time of her arrest).  The effective service date for that number was from February 15, 2019 (approximately when MADRIGAL left her job at WalMart), until the disconnect date of April 2, 2019.

26.    I also received information from T-Mobile relating to another phone number associated with MADRIGAL, 619-274-4537.  Records indicate that this account was active from October 12, 2018, until April 14, 2019.  Thus, MADRIGAL was able to use the T-Mobile number in February 2019.

27.    Based on this, it appears that in February 2019, while keeping her T-Mobile number, MADRIGAL obtained an account with Verizon and a second phone number, 619-372-8578.  She used 619-372-8578 for a little over a month until April 2, 2019, when she switched phone numbers and obtained a different phone number, 619-623-4265 (also with Verizon).  According to the provider records, MADRIGAL used the same device (iPhone 8 Plus with IMEI 354834096919174) with both Verizon accounts.

**D.    Crossing History**

28.    According to MADRIGAL's sister, Oralia Odle, MADRIGAL lived in a two-bedroom apartment in Tijuana, and not in National City.  Based on her employment records, MADRIGAL was not working at WalMart after February 16, 2019.  Between February 15, 2019, and her arrest on April 11, 2019, MADRIGAL had approximately 40 vehicle crossings from Mexico into United States.  Although she was not crossing the border every single day, on several occasions, MADRIGAL crossed twice in the same day.  For example, on Tuesday, March 5, 2019, Madrigal crossed in the Honda at San Ysidro at 6:51 a.m. and then again (in the Honda) at 5:19 p.m.  An hour later, at 6:16 p.m.,

7

the Honda crossed back into Mexico.  On April 8, 2019, MADRIGAL crossed in the Honda at 11:45 a.m. via Otay Mesa POE, and then again at 10:46 p.m. at San Ysidro.

29.     On March 26, 2019, at 4:32 p.m., MADRIGAL crossed in the Honda with an individual named Luis Angel Galvez Sanchez ("Galvez") at San Ysidro POE. Galvez's crossing history prior to that date was as a pedestrian.  One hour later, MADRIGAL and Galvez crossed back into Mexico in the Honda at the Otay Mesa ("OTM") POE.

30.     Subsequently, Galvez crossed together with MADRIGAL in the Honda on the following dates/times:

- March 27 at 12:31 p.m. (San Ysidro),
- April 2 at 10:15 p.m. (San Ysidro),
- April 6 at 1:30 p.m. (San Ysidro),
- April 7 at 11:22 p.m. (San Ysidro),
- April 8 at 11:45 a.m. (OTM), and
- April 9 at 3:42 p.m.

31.     On March 29, 2019, MADRIGAL and Galvez both crossed at San Ysidro at almost the same time:  MADRIGAL drove the Honda at 7:24 a.m., and Galvez crossed as a pedestrian at 7:25 a.m.  They are seen crossing back into Mexico in the Honda at Otay Mesa at 7:48 p.m. on the same day.

32.     After her arrest, MADRIGAL was briefly detained before she posted bail. MADRIGAL listed Galvez as a "sibling" on her jail contact list.  An interview with her sister Oralia Odle revealed that Galvez is not related to MADRIGAL or any of their family members.  Odle stated she did not know who Galvez is.  Odle stated that MADRIGAL allowed an individual by that name to use the 1933 E Avenue in National City as a mailing address, and that Odle remembers a young Hispanic male coming by to pick up mail on one occasion.   Odle's understanding was that this individual was a friend of MADRIGAL's.  Odle stated that Galvez had never resided at the 1933 E Avenue address in National City.

8

33. Certified records from Department of State show that an individual named Luis Angel Galvez Sanchez submitted a U.S. passport application on March 27, 2019, at the City of Chula Vista acceptance facility. Galvez's application listed his mailing address as 1933 E Avenue, National City, CA 91950 (the address where MADRIGAL claimed to live at the time of her arrest). He listed his primary phone number as 619-372-8578 (the Verizon phone number associated with MADRIGAL from February 15, 2019, until April 2, 2019).

34. Based on my training and experience, and consultation with other law enforcement officers experienced in narcotics trafficking investigations, I know that drug traffickers may use different phones and switch phone numbers from time to time to evade detection by law enforcement. In this case, MADRIGAL used several phone numbers during the time period she was crossing into the United States between February 15, 2019, and the day of her arrest on April 11, 2019. The iPhone 8 Plus seized at the time of her arrest was associated with 619-623-4265 and the account was activated on April 2, 2019. Based on the unique IMEI number, it also appears that MADRIGAL used the same iPhone with another number (619-372-8578) between February 15 and April 2, 2019.

35. Based upon my experience investigating narcotics traffickers and the particular investigation in this case, I believe MADRIGAL, and other co-conspirators were engaged in a conspiracy to smuggle narcotics into the United States from Mexico. I also believe the co-conspirators, including MADRIGAL, used cellular phones to communicate and coordinate the importation of narcotics.

36. I believe that MADRIGAL had an iPhone, and an associated iCloud account, during the relevant period of time from February 15, 2019, when she quit her job with WalMart, until her arrest on April 11, 2019. Unless disabled by a sophisticated user, iCloud accounts are automatically created and information automatically backed up. Information on someone's iPhone is automatically backed up to their iCloud account.

37. The forensic examiner report in this case indicates that MADRIGAL's iPhone 8 Plus was PIN locked and only a partial download was available. The partial download showed "Installed Applications" on MADRIGAL's iPhone, which include Whatsapp, Facebook, and Facebook Messenger. The partial iPhone download also showed MADRIGAL's "Contacts." According to the contacts list, MADRIGAL had over 160 Facebook "friends," including "Angel Galvez" and "Luizangel Sanchez."

38. Based on the forensic extraction report of the iPhone 8 Plus, MADRIGAL had an iCloud account with Apple ID cmdlc92@icloud.com. She last backed up her device to the iCloud on April 9, 2019, two days before the arrest in this case.

39. Based upon my experience investigating narcotics traffickers, I believe MADRIGAL used her iPhone, including the various applications installed on the iPhone, to communicate with her co-conspirators about the drug smuggling activities. Based on the evidence that MADRIGAL performed a back-up of her iPhone to the Apple iCloud on April 9, 2019, I further believe that evidence of MADRIGAL's drug trafficking (such as iMessages, text messages, WhatsApp and Facebook Messenger communications, photos, videos, locations, and contacts) may be stored in her iCloud account.

## INFORMATION REGARDING APPLE ID AND iCLOUD

40. Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

41. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.      iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.      iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d.      iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.      Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

11

g.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h.      App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

42.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

43.     An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

44.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date

12

on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

45.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

46.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

13

47.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

48.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

49.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

14

50.     In   addition,   the   user's   account   activity,   logs,   stored   electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

51.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

52.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

53.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the

15

1  crimes under investigation including information that can be used to identify the account's
2  user or users.

3  **PROCEDURES FOR ELECTRONICALLY-STORED INFORMATION**

4  54.    I anticipate executing this warrant under the Electronic Communications
5  Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by
6  using the warrant to require Apple to disclose to the government copies of the records and
7  other information (including the content of communications and stored data) particularly
8  described in Section I of Attachment B. Upon receipt of the information described in
9  Section I of Attachment B, government-authorized persons will review that information
10  to locate the items described in Section II of Attachment B.

11  55.    Federal agents and investigative support personnel are trained and
12  experienced in identifying communications relevant to the crimes under investigation.
13  The ISP's personnel are not.  It would be inappropriate and impractical for federal agents
14  to search the ISP's vast computer network for the relevant accounts and then to analyze
15  the contents of those accounts on the ISP's premises.  The impact on its business would
16  be disruptive and severe.

17  56.    Therefore, I request authority to seize all content, including electronic mail
18  and attachments, stored instant messages, stored voice messages, photographs, and any
19  other content from the subject ISP accounts, as described in Attachment B.  In order to
20  accomplish the objective of the search warrant with a minimum of interference with the
21  ISP's business activities, to protect the privacy of its subscribers whose accounts are not
22  authorized to be searched, and to effectively pursue this investigation, agents seek
23  authorization to allow the ISP to make digital copies of the entire contents of the accounts
24  subject to seizure.  Those copies will be provided to me or to an authorized federal agent.
25  The copy will be imaged and the image will then be analyzed to identify communications
26  and other electronic records subject to seizure pursuant to Attachment B.  Relevant
27
28                                          16

electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

57. Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software. It may also be time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang or typographical errors. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Attachments to electronic mail messages are often in proprietary formats that do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Internet Service Providers like Microsoft and Google do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

58. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination of the ISPs' records will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

59.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

60.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## CONCLUSION

61.     Based on the forgoing, I request that the Court issue the proposed search warrant.

62.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.


I swear the foregoing is true and correct to the best of my knowledge and belief.


Special Agent Jacob R. Schneeberger
HSI Special Agent


Subscribed and sworn to before me this 27th day of November, 2019.


Hon. Jill L. Burkhardt
United States Magistrate Judge

18

## ATTACHMENT A

Apple Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at One Infinite Loop, Cupertino, California, 95014.

<u>ATTACHMENT B</u>

I.    Service of Warrant

The officer executing the warrant shall permit Apple Inc. (the ISP), as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II.   Items subject to seizure from the ISP

a. All subscriber and/or user information, all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, transactional data and any other files or records for:

**cmdlc92@icloud.com**

III.   The search of the data supplied by the ISPs pursuant to this warrant will be conducted by the Homeland Security Investigations as provided in the "Procedures For Electronically-Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to evidence of violations of 21 U.S.C. Sections 952, 960 and 963 involving Claudia MADRIGAL for the period of February 15, 2019 to April 11, 2019 and to seizure of:

a.    Communications, records, attachments, files, and data tending to discuss or suggest efforts to import methamphetamine, or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

b.    Communications, records, attachments, files, and data tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance from Mexico into the United States, or possession and/or

transportation with the intent to distribute federally controlled substances within the United States;

c.   Communications, records, attachments, files, and data tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d.   Communications, records, attachments, files, and data tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substance within the United States, such as stash houses, load houses, or delivery points; and

e.   Communications, records, attachments, files, and data tending to identify the user(s) of the subject accounts, and any co-conspirators involved in the activities in III(a)-(d) above;

f.   Communications, records, attachments, files, and data that provide context to any communications or records described above, such as messages sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject accounts;

**which are evidence of violations of Title 21 U.S.C. §§ 952, 960 and 963 (conspiracy to import and importation of controlled substances).**